**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PALMETTO STATE MEDICAL CENTER,
INCORPORATED,
<u>Plaintiff-Appellee,</u>

v.

OPERATION LIFELINE; DAN W.
BROOKS; MICHAEL CLOER; TEBRA
CLOER; BENJAMIN DAWKINS; JAMES
FREEMAN; WILLIAM GAUTSCH;
GLENDA HAWKINS; ROBIN
HENDERSON; VIRGINIA HOMOL;
LEONARD KULL; RUTHIE KULL;
WALTER LEAGUE; JAMES MARLOW;
BETH MAY; LINVILLE MILLER;

GERALD MEDFORD; ENNY MCDOWELL;
WILLIAM PUTNAM; GROVER OWINGS;
LU RASH; SARA ROLLINS; RAYMOND
SANDFORD; ANNE SCHELL; STEPHEN
TIMMERMAN; JOY VAUGHN; ELIZABETH
WALSH; SUSIE WEDGEWOOD; LINDA
HILLYARD; STEVEN LEFEMINE;
CAROLYN FRIDAL; CARRIE HARROL;
ALBERT PADGETT; KAY MELVIN
DANIEL; CATHERINE GERMAN; GARY
HAWKINS; BRIAN MERRITT; DAVID
SCHELL,
<u>Defendants-Appellants,</u>

and

No. 94-2447

OPERATION RESCUE; SHERRY WATERS;
CAROL WILKINS; DAVID MATTHEWS;
DANNY BARTON; DONALD BOROUGHS;
FRED BRACKEN; LINDA BRACKEN;
VICKIE CARTER; DEBORAH DAVIS;
BENNIE DURHAM; JONATHAN HARDIN;
JEANETTE HORNE; LARRY LEE;
DARRELL LEWIS; ELLEN LEWIS;
RICHARD MERRITT; SUSAN MERRITT;
ROBERT NEWMAN; JOAN OWINGS;
HOWARD RITZENHALER; JAMES
RODERMOND; KATHERINE VARGO;
MIKE VARGO; KENNETH WATERS;
MIKE WHITE,
Defendants.

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
G. Ross Anderson, Jr., District Judge.
(CA-89-2548-3-6)

Argued: May 2, 1995

Decided: July 2, 1997

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

_____

Reversed in part, vacated in part, and remanded by published
opinion.
Judge Widener wrote the opinion, in which Judge Russell and Judge
Hall concur.

_____

**COUNSEL**

**ARGUED:** David Wesley Holmes, HOLMES LAW FIRM, Green-
ville, South Carolina, for Appellants. Randall Scott Hiller, RAN-
DALL S. HILLER, P.A., Greenville, South Carolina, for Appellee.

**OPINION**

WIDENER, Circuit Judge:

Defendants appeal from judgments against them on state-law trespass and civil RICO claims, assigning numerous errors committed by the district court. For the reasons stated below, we reverse in part and vacate and remand in part.

Plaintiff Palmetto State Medical Center is a South Carolina corporation which provides gynecological services, including abortions, to its patients. Defendants originally were 66 individuals who oppose abortion and two anti-abortion entities, Operation Lifeline and Operation Rescue. On April 28, July 5, and July 8, 1989, anti-abortion protestors demonstrated at the Palmetto clinic. Palmetto alleges that on each of these dates some or all of the defendants, participating with Operation Rescue, trespassed on Palmetto property, blocking the entrance and preventing its patients from entering.

As a result of the protests, Palmetto filed an eight-count complaint against defendants in the district court. The only claims at issue on appeal are state-law trespass claims against 41 individuals, Operation Lifeline, and Operation Rescue, and civil RICO claims against four of the individual defendants and Operation Rescue.[1]

At trial, Palmetto called six defendants to the stand to testify.[2] Palmetto also called Lorraine McGuire, an employee at the clinic, and introduced numerous exhibits. At the close of Palmetto's case, defen-

_____

[1] The district court granted directed verdicts to the defendants on Palmetto's claims of state-law nuisance, assault and battery, and interference with contract, as well as on Palmetto's claim of conspiracy to interfere with civil rights under 42 U.S.C. § 1985. These orders have not been appealed. No RICO claim was asserted against Operation Lifeline. Accordingly, that matter was not submitted to the jury, and no RICO judgment was entered against Operation Lifeline.

[2] The testifying defendants were Anne Schell, William Gautsch, Melvin Daniel, Michael Cloer, Dan Brooks, and Joy Vaughn. Of these,

Miss Schell, Brooks, and Gautsch were also named as defendants in Palmetto's RICO claim.

3

dants moved for judgment as a matter of law on the trespass and RICO claims. Before ruling on the motion, the district court suggested that Palmetto needed to introduce additional evidence of defendants' arrests and convictions for criminal trespass. Defendants objected to the introduction of this evidence on the court's own motion after the close of Palmetto's case, but the objection was overruled.

The trespass claims against 25 of the defendants did not go to the jury.[3] The remaining defendants rested without putting on evidence, and the case was submitted to the jury. The jury found the remaining defendants liable for trespass and awarded totals of $2,150 actual and $43,500 punitive damages. The jury also found Operation Rescue, Dan Brooks, William Gautsch, Anne Schell, and Steven Lefemine liable for RICO violations,[4] with total actual damages of $25,000. The district court trebled this amount for total RICO damages of $75,000.

Defendants appeal, alleging several errors committed by the district court. Briefly, defendants argue that the district court erred in denying defendants' motion to compel discovery of the identities of certain Palmetto patients, in admitting statistical evidence relating to Palmetto's loss of clientele on the dates in question, in denying defendants' motion for judgment as a matter of law on the trespass and RICO claims, in reopening Palmetto's case and admitting defendants' answers to Palmetto's requests for admissions, in charging the jury on

_____

[3] The district court, with Palmetto's consent, granted judgment as a matter of law in favor of 24 defendants on Palmetto's claims of trespass, and Palmetto does not appeal these orders. In addition, the trespass and RICO claims against defendant Carol Wilkins were dismissed during trial due to Miss Wilkins' intervening personal bankruptcy filing.

[4] The jury found in favor of defendants Glenda Hawkins, Walter League, and Elizabeth Walsh on the RICO claims. The claim against the eighth individual RICO defendant, Carol Wilkins, was dismissed. See supra note 3. Little or no proof was offered by Palmetto as to what manner of organization best fits Operation Rescue or Operation

Lifeline. The complaint calls them voluntary associations, the answer indicates that each of those entities is a sole proprietorship, and if both are true, each would seem to be able to hold "a legal or beneficial interest in property" under section 1961(3). No objection having been taken by Operation Rescue or Operation Lifeline to the name under which it was sued, we will leave any dispute with respect to that question for another day.

the effects of those admissions, in charging the jury on the effects of
a South Carolina real-property statute on the scope of Palmetto's
lease, and in refusing to allow defendants to testify as to their reli-
gious convictions. Finally, defendants challenge the constitutionality
of RICO as applied to the facts of this case. We address these chal-
lenges below.

## I. TRESPASS

In South Carolina, "[a]lthough the entry by a person on the prop-
erty of another may initially be lawful, the person becomes a tres-
passer when the person fails to depart after being asked by the owner
to leave." Wright v. United Parcel Serv., Inc., 445 S.E.2d 657, 659
(S.C. Ct. App. 1994). For purposes of our analysis of the propriety of
the judgment against defendants on Palmetto's trespass claims, we
will divide the defendants into three groups: the 35 non-testifying
individual defendants, the six testifying individual defendants, and the
two organizations.

## A. Answers to Request for Admissions

At the close of Palmetto's case, defendants moved for judgment as
a matter of law on both the trespass and RICO causes of action. The
court then discussed the lack of evidence supporting Palmetto's tres-
pass claims, particularly relating to the defendants who had not taken
the stand to testify. The district court granted a recess to allow the
plaintiff to produce evidence to avoid a directed verdict. Palmetto
returned with defendants' answers to requests for admission, specifi-
cally answers 12 and 13. Answers 12 and 13 are as follows, as to each
of the individual defendants:

12. That this Defendant has been charged with the crime
of criminal trespass, in accordance with Section 16-11-610,
in the City or County of Greenville, South Carolina.

Answer: Admitted.

13. That this Defendant has been convicted of the crime of
criminal trespass, pursuant to Section 16-11-610, in the City
or County of Greenville, South Carolina.

Answer: Admitted.

Defendants objected to the admission of these admissions as evidence and argue on appeal that the district court erred in allowing Palmetto to introduce the answers. We agree. Taken together, answers 12 and 13 establish only that defendants have been convicted of criminal trespass in or around Greenville, South Carolina. Nothing in the record, for any defendant, ties the conviction admitted in answer 13 to the alleged trespasses at the Palmetto clinic on the dates in question.

Based on the evidence in the record, the jury could not find that the answers to the requests for admission are probative of plaintiff's claim that defendants trespassed on the plaintiff's property on the dates in question. As to the defendants who did not testify, there simply is no other evidence of trespass in the record, as the district court recognized at trial. As to these defendants, then, the answers to the requests for admissions were irrelevant under Fed. R. Evid. 401 and should not have been admitted. Although there is evidence in the record from which a jury could infer that the testifying defendants did trespass on the plaintiff's property on the dates in question, see <u>infra</u> Part I.C, none of the evidence ties the conviction admitted in answer 13 to the Palmetto clinic or to any of the dates alleged in Palmetto's complaint.**5** Thus, as to these defendants, as well, the answers to the requests for admission were irrelevant. We therefore hold that the district court erred in admitting, at the close of plaintiff's evidence, answers 12 and 13 to plaintiff's requests for admissions.

B. <u>Jury Instructions</u>

Having determined that the admission of defendants' answers to plaintiff's requests for admissions was error, we must now determine

---
**5** We note by way of example that several of the testifying defendants admitted involvement in, and arrest resulting from, protests at

another abortion clinic in Greenville, South Carolina. Answers 12 and 13 are completely consistent with events that occurred at that other location. Plaintiff simply never established, as was its burden, that the arrests and convictions to which defendants admitted occurred with respect to plaintiff's clinic on any of the relevant dates.

6

the effect of this error. Defendants argue that the district court's jury charge was in error as it relates to the answers to plaintiff's requests for admissions. The court instructed the jury as follows:

> Under the law, through their attorney, they admitted criminal trespass in this particular case. The effect of those admissions in a court of law requires no further proof, requires no further evidence. As a matter of law, that particular fact is admitted.

(emphasis added). It is at once apparent that this instruction, even if it did not, very nearly directed a verdict for the plaintiff on the trespass count. We agree that this instruction was erroneous. As noted above, the admissions established no more than that these defendants have been convicted of criminal trespass in or around Greenville on an unspecified date. The admissions do not establish, as the district court instructed, that the defendants trespassed "in this particular case," i.e., at the Palmetto clinic on April 28, July 5, or July 8, 1989.

Because we are of opinion that the district court erred in admitting the answers to Palmetto's requests for admission and in instructing the jury that no further evidence on the issue was needed, and because we have no doubt that this error was not harmless, we must at a minimum vacate the jury's verdict finding each defendant liable to Palmetto for trespass. We next address whether, as to each group of defendants, the judgment should be reversed or the case remanded for new trial.

## C. Motion for Judgment as a Matter of Law

Because no evidence was presented that the non-testifying defendants were present on Palmetto's property on the dates in question or were in any way involved with Operation Lifeline or the incidents of April 28, July 5, or July 8, 1989, we hold that those defendants' motions for judgment as a matter of law should have been granted. Accordingly, we reverse the judgments on Palmetto's trespass claims against defendants Tebra Cloer, Benjamin Dawkins, James Freeman, Glenda Hawkins, Robin Henderson, Virginia Homol, Leonard Kull, Ruthie Kull, Walter League, James Marlow, Beth May, Linville Miller, Gerald Medford, Kenny McDowell, William Putnam, Grover

Owings, Lu Rash, Sara Rollins, Raymond Sandford, Stephen Timmerman, Elizabeth Walsh, Susie Wedgewood, Linda Hillyard, Steven Lefemine, Carolyn Fridal, Carrie Harrol, Albert Padgett, Kay Padgett, Michael Phillips, William Ramey, Billy Thames, Catherine German, Gary Hawkins, Brian Merritt, and David Schell.

After reviewing the testimony of the six testifying defendants, we find that there was sufficient evidence, drawing all inferences in Palmetto's favor, to submit the trespass claims against these defendants to the jury. Accordingly, we affirm the district court's denial of defendants Anne Schell, Dan Brooks, Michael Cloer, William Gautsch, Joy Vaughn, and Melvin Daniel's motions for judgment as a matter of law on Palmetto's trespass claims. Because of the district court's error in admitting defendants' admissions 12 and 13 and in instructing the jury on the effects of those admissions, however, the judgment as to each of these defendants is vacated and the action remanded for new trial on Palmetto's trespass claims.

Finally, we review the evidence against Operation Rescue and Operation Lifeline relating to trespass. There is no evidence that Operation Rescue trespassed or conspired to trespass on Palmetto's property on any of the relevant dates. Plaintiff presented no evidence at trial that Operation Rescue was affiliated with any individual defendant or with Operation Lifeline, that Operation Rescue knew of the organization or execution of Operation Lifeline's activities on April 28, July 5, or July 8, 1989, or that Operation Rescue provided any support for those activities beyond the distribution of literature. None of this literature could reasonably be construed as participation in the activities of April 28, July 5, or July 8, 1989 at Palmetto. To hold Operation Rescue liable in these circumstances would be to hold it liable for every act of trespass that occurs in protest of abortion in this country based solely on the exercise of its constitutional right to advocate generally the cessation of abortions. Accordingly, we reverse the trespass judgment against Operation Rescue.

Because there is evidence from which the jury could have found that Operation Lifeline did participate in the protests of April 28, July 5, and July 8, 1989, with knowledge that unlawful trespass might

occur, we will not reverse the trespass judgment against Operation Lifeline. However, as in the case of the individual testifying defen-

8

dants, and because any judgment against Operation Lifeline need be supported by their testimony, we vacate the trespass judgment against Operation Lifeline and remand for new trial in the light of the district court's error in admitting the answers to Palmetto's requests for admission and in instructing the jury on the effects thereof.

## II. RICO

The defendants also argue that the district court should have entered judgment as a matter of law in favor of Operation Rescue,[6] Dan Brooks, William Gautsch, Anne Schell, and Steven Lefemine on the RICO count of Palmetto's complaint. The district court properly instructed the jury that the defendants had a First Amendment right to protest but could not exercise this right in a way that wrongfully infringed on Palmetto's right to provide abortion services. Palmetto alleged that the defendants exceeded the boundaries of lawful First Amendment activity and violated 18 U.S.C. § 1962(c) and (d)[7] by committing, or conspiring to commit, violations of the Hobbs Act, 18 U.S.C. § 1951. Palmetto sought treble damages under 18 U.S.C. § 1964(c).

---

[6] In their brief, the defendants argue that the RICO judgment against Operation Lifeline should be reversed. Palmetto's brief also refers to the RICO judgment against Operation Lifeline. However, no RICO judgment was entered against Operation Lifeline because it was never a RICO defendant. We will assume that these references to Operation Lifeline are the typographical errors they obviously were. The case was tried with Operation Rescue as a RICO defendant from the complaint, the jury was so instructed, the verdict form was to that effect, and the RICO judgment was against Operation Rescue, not Operation Lifeline.

[7] Subsections (c) and (d) read:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any
of the provisions of subsection . . . (c) of this section.

18 U.S.C. § 1962.

9

To prove a violation of § 1962(c), Palmetto must show that each RICO defendant conducted an enterprise through a pattern of racketeering activity, <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985), and that Palmetto was injured in its business or property as the result of such conduct. See 18 U.S.C. § 1964(c); <u>Sedima</u>, 473 U.S. at 496-97. To prove a RICO conspiracy under § 1962(d), Palmetto must show that defendants conspired to violate § 1962(c).

Initially, Palmetto must show an enterprise, which is defined as an ongoing organization, formal or informal, in which the various associates function as a continuing unit. <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981). The enterprise must be distinct from the persons alleged to have violated § 1962(c). <u>New Beckley Mining Corp. v. International Union, United Mine Workers of America</u>, 18 F.3d 1161, 1163 (4th Cir. 1994); <u>Busby v. Crown Supply, Inc.</u>, 896 F.2d 833, 840 (4th Cir. 1990); <u>United States v. Computer Sciences Corp.</u>, 689 F.2d 1181, 1190 (4th Cir. 1982). Palmetto alleged in its complaint that Operation Rescue was the RICO enterprise. A recovery of money damages under 18 U.S.C. § 1964(c) is not against a RICO enterprise, but against a RICO defendant who is a "person employed by or associated with" a RICO enterprise. 18 U.S.C. § 1962(c).

To demonstrate a pattern of racketeering activity under § 1962(c), Palmetto must prove that, at a minimum, each RICO defendant committed two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5). The predicate acts must be related and must amount to or pose a threat of continued criminal activity. See <u>H.J. Inc. v. Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 240-43 (1989). Palmetto alleged extortion under the Hobbs Act, 18 U.S.C.§ 1951, as the racketeering activity in this case. Extortion, attempted extortion, and conspiracy to extort under the Hobbs Act are explicitly identified as requisite predicate acts under § 1961. 18 U.S.C. § 1961(1)(B).

The record in this case, however, contains no evidence that Dan Brooks, William Gautsch, Anne Schell, and Steven Lefemine, or any of them, conducted Operation Rescue's affairs in violation of the Hobbs Act because there is no evidence that these defendants conducted any of Operation Rescue's affairs whatsoever on the dates in question. Palmetto simply offered no proof to that effect.**8** Because

---

**8** Whether or not there may have been proof that the affairs of Operation Lifeline were operated in violation of RICO or that Operation Life-

Palmetto failed to prove an essential element of its RICO claims as alleged in its complaint, the RICO judgments against Operation Rescue,[9] Lefemine,[10] Brooks, Gautsch, and Miss Schell cannot stand. See Riverwoods Chappaqua Corp. v. Marine Midland Bank, 30 F.3d 339, 343 (2d Cir. 1994).

III. OTHER ISSUES

On remand, we agree with the defendants that plaintiff cannot recover damages based on the loss of patients without identifying who those patients are and permitting inquiry as to why they did not appear for their scheduled appointments at Palmetto's clinic. Palmetto presented evidence of differentials in patient attendance rates on the

_____

line was a RICO enterprise are not questions before us, and we express no opinion on them.

[9] In the appendix to this opinion, we have listed each reference in the trial record to Operation Rescue. The judgment against Operation Rescue as a RICO enterprise must be reversed in any event under New Beckley Mining, Busby, and Computer Sciences, because the RICO enterprise must be distinct from the persons alleged to have violated § 1962(c). New Beckley Mining, 18 F.3d at 1163; Computer Sciences, 688 F.2d at 1191; see also Brittingham v. Mobil Corp., 943 F.2d 297, 301 (3d Cir. 1991).

Also, we have found no evidence that Operation Rescue engaged in, authorized, advocated, conspired to commit, assisted in, or was aware of any of the predicate acts alleged in this case. To the extent plaintiff has shown that Operation Rescue provided nonspecific literature to Opera-tion Lifeline or expressed pleasure after the fact with the results of a rele-vant protest and published those results, it engaged in protected activity under the First Amendment and not in any Hobbs Act or other federal violation.

[10] We further note that Lefemine also could not be liable under RICO

in any event because we have reversed the trespass judgment against him and because there is no evidence whatsoever that he engaged in or con- spired to engage in any illegal acts. The only evidence in the record at trial mentioning Lefemine is the appearance of his name and telephone number on a single Operation Lifeline document. Pl.'s Ex. 16. There was no proof before the jury establishing that Lefemine even knew of the existence of Operation Rescue.

11

relevant dates from 1988 to 1989, which it offered as proof of damages. Absent inquiry as to why the patients missed their appointments, however, we find this evidence speculative at best and thus insufficient as a matter of law to establish the financial loss suffered by Palmetto as the result of defendants' conduct. Suppose, for example, one of the patients missed her appointment because of a sick child. That missed appointment could not be laid at the door of the defendants. Also, suppose, for example, that another patient missed her appointment because of the pickets, having nothing to do with any trespass. That, also, could not be laid at the door of the defendants. While admitting evidence of missed appointments might well have been within the discretion of the district court with respect to relevance, admitting such evidence without permitting inquiry by the defendants of the patients as to the reasons for missed appointments would be, by the same token, an abuse of discretion.

We also agree with defendants that the district court erred in excluding their testimony as to their religious motives, but only insofar as the testimony would have related to punitive damages. A religious motive cannot shield the defendants from the consequences of otherwise unlawful activity. However, the Supreme Court has decided that evidence of a defendant's state of mind is admissible with respect to an award of punitive damages. <u>Herbert v. Land</u>, 441 U.S. 153, 162-63 (1979); <u>Beckwith v. Bean</u>, 98 U.S. 266, 274 (1879); accord, <u>Gilbert v. Duke Power Co.</u>, 179 S.E.2d 729, 723 (S.C. 1971) ("When the recovery of exemplary damages is sought . . . evidence of any fact which legitimately tends to show the motive and intent of the defendant in doing the act complained of is admissible--as for example, the existence or absence of malice or other aggravations essential to the allowance of such damages."). Testimony about the defendants' religious convictions presents evidence of their state of mind and thus is admissible on the punitive damages question. Accordingly, the testimony should have been admitted, but only in connection with this issue.

Finally, defendants argue that the district court erred in

instructing
the jury that South Carolina Code § 27-35-70[11] "means that the prop-

_____

[11] In all cases of tenancy the owner, landlord, or person

12

erty you are in possession of for tenancy purposes <u>or used by you</u> shall be interpreted to come under the lease." (emphasis added).

While the record is not clear, apparently there was disagreement at trial as to whether or not a parking lot supposedly used by Palmetto was a part of Palmetto's leased property on which the abortion clinic was conducted. The lease between the owner of the premises and Palmetto is an exhibit, and, absent explanation, which does not appear in the record, indicates that a building of 2,880 square feet is 100% of the property included in the lease. That, of course, would exclude the parking lot. There was also evidence, however, which may have tended to show that the property used by Palmetto included a parking lot, shown on a tax map, which was referred to by a witness and was introduced into evidence, but which does not appear in the record. The apparent intent of the introduction of the tax map was to show that the parking lot used by Palmetto was, in fact, included in the leased property. No instruction was given to the jury with respect to any dispute over the parking lot.

If there is disagreement between the parties, as there seems to be, over whether or not the parking lot was a part of Palmetto's property on which it could prevent trespassing, that question may be tried on remand.

The statute in question, which has not been construed by the South Carolina courts, seems to us to be little, if anything, more than a restatement of the law that a tenant is estopped to deny his landlord's title. See <u>Maples v. Spencer</u>, 81 S.E. 483, 484 (S.C. 1914); <u>Minor on Real Property</u> § 383 (2d ed. 1928). There was no issue in the case which has come to our attention of any doubt that Palmetto held what- ever property it leased under its landlord. And the instruction, even if incorrect and out of place, might not be reversible error. Neverthe- less, we recognize that that part of the instruction we have italicized

_____

entitled to possession shall be deemed to be in possession of the real estate used or occupied by the tenant and the tenant

shall be
deemed to be holding thereunder.

S.C. Code § 27-35-70.

13

might be quite damaging to the defendants. On remand, the district court should not give any instruction on the statute mentioned unless it is related to something at issue in the case.

Finally, since there is no liability in this case under the RICO statute, we should not, and do not, decide the questions raised by the defendants with respect to whether or not the statute is constitutionally invalid as applied. <u>Ashwander v. T.V.A</u>, 297 U.S. 288, 341, 347 (1936) (Brandeis, J., concurring).

IV. CONCLUSION

For the foregoing reasons, the trespass judgments against Operation Lifeline, Miss Schell, Miss Vaughn, Brooks, Cloer, Gautsch, and Daniel are vacated and remanded for a new trial consistent with this opinion. The trespass and RICO judgments against all the remaining defendants are reversed.

On remand, the district court should decide whether it will retry the trespass judgments mentioned just above against Miss Schell, Miss Vaughn, Brooks, Cloer, Gautsch, and Daniel, which were remanded and not reversed, or whether it will dismiss those trespass claims as pendent state claims.

<u>REVERSED IN PART, VACATED IN PART,</u>
<u>AND REMANDED WITH INSTRUCTIONS</u>

14

**APPENDIX**

The following summarizes all references to Operation Rescue contained in the record at trial. It is organized first by the testimony of
individual witnesses and then by trial exhibit number.

I. Witnesses' Testimony

A. <u>Anne Schell</u>. Early in Miss Schell's testimony, plaintiff's attor-
ney asked whether Operation Lifeline is "an organization that wants
to educate people in Operation Rescue or what's known as a rescue."
J.A. at 180. She responded that the purpose of what she does "is try
to educate people about what abortion really is." J.A. at 180. Plain-
tiff's attorney also introduced questionnaires that Operation Lifeline
had distributed to interested individuals (Pl.'s Exs. 35 and 36). J.A.
at 181-83. The questionnaires contain a space allowing an individual
to indicate interest in Operation Rescue. J.A. at 183, 464, 465. The
attorney then asked whether Miss Schell knew what Operation Res-
cue is, and she answered, "That's a group of--I guess it's the
national. . . . What I know about Operation Rescue, the national orga-
nization, is that they want to get the information out about abortion.
It's not primarily to break laws." J.A. at 183-84.

The attorney subsequently introduced another document entitled
"The Rules of Rescue" and alleged that Operation Rescue produced
it (Pl.'s Ex. 49). J.A. at 186-88. Miss Schell said she was not sure if
that was so and also denied that Operation Rescue and Operation
Lifeline are sister organizations. J.A. at 188. She explained that Oper-
ation Lifeline is "just a local group of people." J.A. at 188. She stated
that Operation Lifeline is not affiliated with anybody and does not
have a membership in or contribute funds to Operation Rescue,
although Operation Lifeline does obtain material from Operation Res-
cue about abortion. J.A. at 188. She said it is possible that Operation
Lifeline sends information to Operation Rescue but that she does not
do so herself. J.A. at 188-89. She testified that she has never been on
a conference call with Randall Terry or other members of Operation

Rescue but that she has heard "they" have them. J.A. at 189.

When the attorney introduced additional Operation Rescue material discussing what to do during a rescue and in event of arrest (Pl.'s Exs.

15

44 and 45), Miss Schell stated that the material was in Operation Life-line's files and that it was given to interested people. J.A. at 190-91. She denied that it was sent for the purpose of duplicating and distrib-uting to Operation Lifeline members. J.A. at 191. She admitted that Operation Rescue sent Operation Lifeline statistics on its National Day of Rescue dated October 28, 1988 (Pl.'s Ex. 48). J.A. at 192-94.

Miss Schell further acknowledged that she had met Joseph Fore-man, who is the southeast regional director for Operation Rescue, and that she had received a letter containing a check from the pastor of Southside Baptist Church to help toward the expenses of having Fore-man speak at a local church (Pl.'s Ex. 23). J.A. at 196, 200-01, 206. She reiterated, however, that Operation Lifeline is not affiliated with Operation Rescue. J.A. at 206. She also stated that Foreman is not a director of Operation Lifeline and that Operation Lifeline invites "people from a lot of different organizations to come and speak to our people." J.A. at 206. She claimed again that she did know of Opera-tion Lifeline completing an Operation Rescue questionnaire and send-ing it back to Operation Rescue (Pl.'s Ex. 20). J.A. at 206-07. She affirmed that she had received two editions of the "Rescue News-Brief" (Pl.'s Exs. 40 and 41), but she explained, "A lot of people get those. I'm on the mailing list." J.A. at 208.

She later testified that she has traveled to Chicago and New York and met with people from Operation Rescue there and stated that Operation Rescue's headquarters are in Binghamton, New York. J.A. at 212-13. She also said that she attended a protest organized by Operation Rescue in Atlanta. J.A. at 214. She confirmed that Opera-tion Lifeline was set up after she had been to Atlanta and learned about Operation Rescue. J.A. at 214.

She did not remember ever referring to Operation Lifeline as a sis-ter organization of Operation Rescue. J.A. at 213. She further stated that although Operation Lifeline and Operation Rescue do some of the same things they are not affiliated per se. J.A. at 213-14. She asserted that there is no membership in Operation Rescue. J.A. at 216. She said she knows that Operation Rescue is a group, but she has never

filed any formal reports with them. J.A. at 218. Finally, she admitted
that Operation Lifeline has reported on the activities of Operation
Rescue leaders in its newsletter (Pl.'s Ex. 15). J.A. at 219-20.

16

B. <u>William Foster Gautsch</u>. Gautsch testified that he had partici-
pated in an Operation Rescue rescue in New York City. J.A. at 225.
He said he is not a member of Operation Rescue. J.A. at 227.

C. <u>Melvin Earl Daniel</u>. Daniel stated that he had never signed a
membership card with Operation Rescue. J.A. at 248.

D. <u>Joy Vaughn</u>. Miss Vaughn testified that to her knowledge no
one affiliated with Operation Rescue was in Greenville County on
April 28, 1989 or in February 1989. J.A. at 260. She said that she
was
not affiliated with Operation Rescue, had never contributed to
them,
and was not on their mailing list. J.A. at 260.

E. <u>Michael Clarence Cloer</u>. There is no reference to Operation
Rescue in Dr. Cloer's testimony.

F. <u>Dan Winston Brooks Jr.</u> Brooks, Operation Lifeline's director,
acknowledged that he has attended Operation Rescue meetings, is
friends with Operation Rescue's Southeast Regional Director Joseph
Foreman, and has traveled to Operation Rescue headquarters in New
York. J.A. at 272-73. He said he has received copies of a rescue
newsbrief from Operation Rescue and has sent statistical
information
to the group (Pl.'s Ex. 11). J.A. at 284. He confirmed that he has
had
phone conferences with Operation Rescue leaders but asserted that
they were not about organizing rescues. J.A. at 287.

He denied that he ever had teleconferences with Operation Res-
cue's leader, Randall Terry, where the intent was to prevent physi-
cally individuals from obtaining an abortion or relating to
trespassing
intentionally on private property. J.A. at 289. He said he has dis-
cussed coordinating trespassing on private property with an
Operation
Rescue member to the extent that it might possibly occur, but not
as
an intention. J.A. at 289. He denied that Operation Rescue ever
sent
Operation Lifeline information telling them a date it wished for
them
to trespass on private property but affirmed that Operation Rescue
had
designated a day for rescuing. J.A. at 289-90.

He further stated that he had been arrested in Atlanta while
attend-
ing an Operation Rescue protest. J.A. at 294-95. He characterized
the

17

contact between Operation Lifeline and Operation Rescue as sporadic rather than continuous. J.A. at 295. He affirmed that Operation Life-line periodically obtained information from and sent statistics to Operation Rescue prior to April 28, July 5, and July 8, 1989. J.A. at 295. He denied that Operation Rescue ever sent guidelines to Operation Lifeline on how to conduct a rescue. J.A. at 295.

G. <u>Lorraine D. McGuire</u>. There is no reference to Operation Rescue in Miss McGuire's testimony.

II. Trial Exhibits

A. <u>Plaintiff's Exhibit 11--Operation Lifeline Newsletter Vol. 1, No. 2 (J.A. at 442)</u> (admitted into evidence J.A. at 235). Sets forth statistics on what happened nationally and locally for the National Day of Rescue. J.A. 442. Refers to Operation Rescue protest activity in Pittsburgh, Pennsylvania. J.A. at 443.

B. <u>Plaintiff's Exhibit 15--Lifeline Letter 1/10/89 (J.A. at 453)</u> (admitted into evidence J.A. at 211). Refers to activities of Operation Rescue leaders in New York on January 12-14. J.A. at 453. Announces that Joseph Foreman will be in town on January 19 and will give a speech on January 20. J.A. at 453. A drawing in the margin beside information on a January 21 abortion protest depicts a sign stating "Operation Rescue is Coming." J.A. at 454.

C. <u>Plaintiff's Exhibit 20--Blank Operation Rescue Questionnaire (J.A. at 459)</u> (admitted into evidence J.A. at 207). Asks local rescue leaders or organizers to send in information on lawsuits and any other concerns. J.A. at 459-60.

D. <u>Plaintiff's Exhibit 21--Picketing Assignment for Operation Life-line (J.A. at 461)</u> (admitted into evidence J.A. at 199). Not dated. Asks individuals to pray for "Lifeline, Operation Rescue, and others seeking to help in this fight." J.A. at 461.

E. <u>Plaintiff's Exhibit 22--Lifeline Picket Pointers (J.A. at 462)</u> (admitted into evidence J.A. at 200). Not dated. A drawing in the margin beside information on an unspecified abortion protest depicts a

sign stating "Operation Rescue is Coming." J.A. at 462.

18

F. <u>Plaintiff's Exhibit 23--Letter to Anne Schell from Dr. Walter Hardford of Southside Baptist Church in Greenville, S.C. 1/13/19 (J.A. at 463)</u> (admitted into evidence J.A. at 201). Contains a check
to help toward the expenses of having Joseph Foreman. J.A. at 463.

G. <u>Plaintiff's Exhibits 35 and 36--Lifeline Questionnaires Completed by Dayne Griffin and Mary Jane Freeman (J.A. at 464, 465)</u> (admitted into evidence J.A. at 182). One question asks whether the individual is interested in Operation Rescue and is checked in the affirmative on both forms. J.A. at 464, 465.

H. <u>Plaintiff's Exhibit 37--Picketing Information for Lifeline (J.A. at 466)</u> (admitted into evidence J.A. at 185). Not dated. Asks individ-
uals to pray for "Lifeline, Operation Rescue, and others seeking to help in this fight." J.A. at 466.

I. <u>Plaintiff's Exhibit 40--Operation Rescue NewsBrief April/May 1989 (J.A. at 467)</u> (admitted into evidence J.A. at 209). Sent to Dave
and Anne Schell. J.A. at 474. Contains no mention of South Carolina,
Operation Lifeline, or the individuals named as RICO defendants.[1]

J. <u>Plaintiff's Exhibit 41--Operation Rescue NewsBrief June/July 1989 (J.A. at 475)</u> (admitted into evidence J.A. at 209). Sent to Dave
and Anne Schell. J.A. at 482. Contains no mention of South Carolina,
Operation Lifeline, or the individuals named as RICO defendants.

K. <u>Plaintiff's Exhibit 44--Information entitled "Sample-- Atlanta" (includes flyer entitled "Operation Rescue Atlanta October 3-8") (J.A. at 484)</u> (admitted into evidence J.A. at 192). Contains no mention of
South Carolina, Operation Lifeline, or the individuals named as RICO
defendants.

L. <u>Plaintiff's Exhibit 45--Information entitled "Sample--Atlanta (J.A. at 487)</u> (admitted into evidence J.A. at 192). Provides general
information on the criminal process and bonding procedure. J.A. at 487. A special note at the head of the document states, "Operation

---

[1] The phrase "individuals named as RICO defendants" refers to Dan Brooks, William Gautsch, Steven Lefemine, and Anne Schell.

19

Rescue cannot guarantee what the system will do. The following statements are based upon our previous experience in Atlanta." J.A. at 487.

M. Plaintiff's Exhibit 49--Rules of Rescue (J.A. at 490) (admitted into evidence J.A. at 190). Discusses in general terms how to behave
during a rescue, what to expect after arrest, and what participant needs for prison. J.A. at 490-91. The only reference to Operation Res-
cue appears in the third sentence of the document's third paragraph:
"If you have not been assigned to do media interviews by Operation Rescue, please direct these reporters to those assigned to do inter-
views." J.A. at 490.